McCLENDON, Judge Pro Tem.
Betty T. Burgess filed suit against the Caddo Parish Police Jury (Police Jury), their insurer, and the City of Shreveport (City), for damages resulting from injuries she sustained when she fell at a polling place while attempting to vote in a statewide election. Mrs. Burgess died as a result of these injuries and her daughter, Elizabeth Burgess Maffett, was substituted as party plaintiff.
The Police Jury filed a third party demand against the State of Louisiana through the Caddo Parish Board of Election Supervisors (State). The State was dismissed from the case on an exception of no cause of action. However, this court reversed the trial court and remanded the case for trial. Burgess v. City of Shreveport, 421 So.2d 1141 (La.App. 2nd Cir. 1982). Prior to trial the City settled with the plaintiff.
The trial court found the City and State were liable to the plaintiff, but absolved the Police Jury of any liability. The total damage award of $142,615.73 was reduced by one-half because of the settlement with the City.
Plaintiff and the State appealed the trial court decision. The plaintiff alleges the trial court erred in not holding the Police Jury liable on either a negligence or strict liability theory and erred in awarding inadequate damages for pain and suffering and wrongful death.
The State alleges the trial court erred in finding the State liable for plaintiff’s injuries while failing to find the Police Jury liable, and erred in awarding excessive damages for pain and suffering.

Facts

On December 8, 1979 a statewide general election was held in Louisiana. Betty T. Burgess, then 86 years old, was driven by a neighbor, Gladys Rosenkrans, to their polling place for the purpose of voting. The polling place for their precinct was located at the City of Shreveport Fire Station No. 11 on Youree Drive in Shreveport. Because Mrs. Rosenkrans had voted earlier that day, she dropped Mrs. Burgess off in front of the fire station and drove around the block while she attempted to vote.
The voting area was located in the garage of the fire station. During elections held in warm weather the garage door to the fire station remained open, allowing voters safe access to the voting area by way of the driveway leading into the ga *863 rage. Since the weather was cold on December 8, the garage door to the fire station was closed.
Mrs. Burgess entered the fire station by the front door (as most voters did that day) and walked through the living quarters of the firemen towards the garage area. At the door leading from the living quarters into the garage there was a six-inch step-down in the floor. Mrs. Burgess attempted to walk into the garage to vote and fell at the step-down.
As a result of the fall Mrs. Burgess suffered a broken arm and a broken hip. After an initial hospitalization of a month and a half, she was released to the care of a nursing home. Mrs. B.urgess was re-admitted to the hospital on two other occasions prior to her death. She was eventually placed in a nursing home where she resided until she passed away on March 21, 1981.
The trial court found the six-inch step-down constituted a defect. Factors such as the dim lighting at the step-down and the uniform color of the living area and garage floors made it difficult to discern. C. Donald Attaway, who was accepted as an expert in the field of safety, testified the step-down was a hazard. He also stated this was a violation of the Life Safety Code, which specifies the safety requirements for steps, ramps, and openings in public buildings. This finding is not disputed on appeal.
Although the City and the plaintiff reached a settlement prior to trial, the lower court properly considered the City’s liability in order to determine if the release of that defendant would cause the plaintiffs award to be reduced on a pro rata basis. La. Civil Code Article 2103; Raley v. Carter et al, 412 So.2d 1045 (La.1982). The trial court found the City liable to plaintiff based on strict liability and negligence.
The testimony at trial established that the City, owner of the premises, did not relinquish care and custody of the entire fire station during the election, only the garage area where the voting was taking place. Based on Civil Code Article 2317, the trial court found the City was strictly liable to plaintiff because the damage was caused by a thing in their custody.
Firemen employed by the City remained on the premises during the election. Firemen were watching television in the living area as Mrs. Burgess walked through on her way to the garage to vote. If the commissioners desired to open the garage door, the firemen would be responsible for accomplishing this task.
Further, the trial court held the City was negligent for its failure to warn of the defect or repair same and, therefore, liable under Civil Code Article 2315, irrespective of the fact the City was under no obligation to allow the fire station to be used as a polling place. The appellants do not dispute these findings on appeal.

Liability of the State

Statewide elections such as that of December 8, 1979 are conducted by the State through the Board of Election Supervisors of each parish. R.S. 18:423 states:
A. Creation. There is created a board of election supervisors for each parish.
B. Powers and duties. The parish board of election supervisors shall supervise the preparation for and conduct of all elections held in the parish.
In order to conduct an election in their respective parishes, the board selects commissioners to work the polling places established in the precincts of each parish. Four commissioners and one commissioner in charge are appointed to man each precinct station.
Once the commissioners are selected, they attend a training session given by the Clerk of Court of their parish. In this training session the procedures to be followed on election day are reviewed.
Two commissioners present at the time Mrs. Burgess fell testified at trial. John Holden was operating the latch on the voting machine which prepares the machine for a new voter on the day of the accident and he observed the fall. He testified he noticed voters stumbling at the step-down *864 that day and he had also stumbled there prior to Mrs. Burgess’ fall.
Perilee Tyler Vowells was working at the desk signing the voters’ names in the poll book at the time of the fall. She testified she had noticed voters stumbling at the step-down and had heard voters comment on the condition. Neither commissioner mentioned the situation to the commissioner in charge or to the firemen on duty or took steps to remedy the hazard on their own.
Both commissioners testified they were given no instructions concerning safety of the voters at the preelection training session they attended. However, the testimony of Roy Towns, who conducted the training session, and A.W. Fulco, Registrar of Voters in Caddo Parish and a member of the Caddo Parish Board of Election Supervisors, established that the role of the commissioner is to insure the orderly function of the precinct. This includes the responsibility of insuring the voters are able to enter and leave the polling place in an orderly fashion.
Applying the duty/risk analysis to these facts, we find the commissioners had a duty, once the hazardous condition was discovered, to correct the situation. There were several ways this might have been done. The commissioners could have requested one of the firemen on duty to stand at the door and warn voters of the step-down, or placed a warning sign on the door. There was a back door entrance to the garage which led to a parking lot. This entrance, like the entrance through the garage doors, did not have a step-down. Voters could have been rerouted to this entrance with little trouble, completely eliminating the hazardous condition.
Since the commissioners did nothing to correct the hazardous situation, the duty was breached.
Finally, did the duty to correct the hazardous situation that had been discovered encompass the risk that an elderly voter would stumble over the hazardous condition as she attempted to get to the voting area? We hold the duty encompassed just such a risk.
The commissioners were negligent in their failure to take corrective actions, and as employees of the State, this negligence is imputed to the State. See Thibodeaux v. State of Louisiana etc., 371 So.2d 1227 (La.App. 3rd Cir.1979).

Liability of the Police Jury

As the trial court correctly stated, the Police Jury was not the owner or custodian of the fire station and exercised no control over the fire station on the day of the election. However, the Police Jury, pursuant to R.S. 18:533, selected the fire station as a polling place. R.S. 18:533 states in part:
A. Establishment. The governing authority of each parish shall establish one polling place for each precinct.
B. Location.
(1) Except as otherwise provided in this Subsection, the polling place for a precinct shall be located in the precinct in a suitable public building, or, if none is available, then on private property, (emphasis added)
David D. Jarrett, employee of the Police Jury, testified he is in charge of selecting polling places for Caddo Parish, subject to vote of the Police Jury. In selecting a new polling place he stated he inspects the premises for location and accessibility for the public and handicapped citizens. Once a site is chosen, the Police Jury requests permission of the owner of the premises (in this case the City) to use the facility. He further stated fire stations are preferred as polling places because of their accessibility ,and location. Fire Station No. 11 had been used as a polling place for at least 34 years without complaint prior to the December 1979 election, therefore Jarrett did not inspect the premises prior to the election.
Applying the duty/risk analysis, we find the Police Jury fulfilled its duty to select a suitable polling place by selecting the fire station. As pointed out, in terms of acces *865 sibility and location, fire stations are superior to most facilities.
Further, the duty to select a suitable location does not encompass the risk that an elderly voter would trip over a six-inch step-down at an entrance, especially considering the fact that the location had been used safely as a polling place for 34 years. Imposing a greater burden on the Police Jury would make it difficult for them to carry out the mandate of R.S. 18:533. We agree with the trial court’s finding that the Police Jury was not liable for Mrs. Burgess’ injuries.

Quantum

Plaintiff alleges the trial court awards for pain and suffering and wrongful death were inadequate. The State alleges the award for pain and suffering was excessive.
In the survival action the trial court awarded $75,000 for pain, suffering and mental anguish experienced by Mrs. Burgess prior to her death. No one disputes the fact that before the fall Mrs. Burgess was active and self supporting. She lived alone and relied on others only for transportation.
As a result of the fall she suffered a fractured left hip which required an operation to insert a pin which immobilized the fracture. She also fractured her left forearm which was placed in a cast. Three days after surgery she suffered a blood clot which was the result of complications from the surgery.
Mrs. Burgess remained in the hospital until her release to the care of a nursing home on January 21, 1980. However, five days later she was admitted to the Intensive Care Unit of P & S Hospital because of chest pain and shortness of breath. She remained in intensive care for one month, during which she was operated on to stop blood clots from occurring. After an unsuccessful attempt to return to her daughter’s home she was readmitted to intensive care in early March. On March 10, 1980 she suffered two cracked ribs from an elec-trie shock defibrillator which was applied to her chest after her heart failed. After a three week stay in intensive care, she was released to a nursing home.
Mrs. Burgess never recovered to her former state of health and began to suffer from depression. After the fall she remained in a nursing home or hospital for the remaining fifteen and one-half months of her life except for the one week she attempted to reside with her daughter.
As Dr. Seborn Woods, Mrs. Burgess’ physician, stated, “She had a very long and traumatic recovery period and this was primarily because she kept throwing clots to her lung from somewhere.” Although he was not positive the blood clots were coming from the leg, the evidence established that the fall triggered a gradual deterioration of Mrs. Burgess’ bodily functions, which ended in her death.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused his discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court’s award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982); Winterrowd v. The Travelers Indemnity Co., 440 So.2d 822 (La.App. 2d Cir.1983). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Winterrowd v. The Travelers Ind. Co., supra.
Our review of the record leads us to the conclusion that a $75,000 award for pain, suffering and mental anguish experi *866 enced by Mrs. Burgess prior to her death, although on the low side, was not an abuse of the trial court’s discretion.
The trial court awarded $15,000 to plaintiff for the wrongful death of her mother. In doing so the court noted the close relationship between the two, but also considered the short life expectancy of an 86 year old person. We cannot say the trial court abused its discretion in making the wrongful death award.
For these reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed one-half to each appellant.