600 So.2d 837 (1992)
Phelon HUNTER, Plaintiff-Appellant,
v.
The KROGER COMPANY and CNA Insurance Co., Defendants-Appellees.
No. 90-1262.
Court of Appeal of Louisiana, Third Circuit.
May 20, 1992.
*839 Payton R. Covington, Lake Charles, for plaintiff-appellant.
Plauche, Smith & Nieset, Christopher P. Ieyoub, Lake Charles, for defendant-appellee, Kroger.
Woodley, Williams, Fenet, Palmer, Boudreaux & Norman, Alfred P. Boudreaux, Lake Charles, for defendant-appellee, CNA.
Before GUIDRY and STOKER, JJ., and PATIN[*], J., Pro Tem.
STOKER, Judge.
This appeal involves a suit for personal injury damages sustained in a slip and fall accident at a Kroger's supermarket. The issues presented for our review concern the jury's apportionment of fault, the court's admission of alleged hearsay evidence, and the amount of damages awarded by the jury.
Phelon Hunter filed suit against the Kroger Company and its insurer, CNA Insurance Company, seeking damages for injuries allegedly sustained when Hunter slipped on a grape while in Kroger's store. The jury awarded Hunter $40,000 in damages and attributed 90% of the fault to Hunter and 10% to Kroger's. Hunter appealed. We reverse that portion of the judgment attributing 90% of the fault to Hunter, and amend the judgment to reflect damages for pain and suffering in the amount of $120,000, for past medical expenses in the amount of $17,138.78, and for future medical expenses in the amount of $15,000. We affirm the judgment in all other respects.

FACTS
On November 21, 1988, Dr. Lynn Foret performed arthroscopic surgery on Hunter's left knee. Dr. Foret prescribed the use of crutches for Hunter following the surgery. Hunter testified that a couple of days prior to the slip and fall, Dr. Foret told him to discontinue using the crutches. There are discrepancies in Hunter's testimony concerning whether Hunter should have been using a cane on the date of the accident. In deposition, Hunter stated that he was supposed to be using a cane; at trial he stated that he could not remember whether Dr. Foret told him to use a cane. In any event, Hunter was not using crutches or a cane at the time the accident occurred.
On December 11, 1988, Hunter and his wife, Ilse Hunter, went to Kroger's. While Mrs. Hunter was paying for groceries, Mr. Hunter started to walk between two checkout stands in an attempt to get to the front of the store. While doing so, he stepped on at least one grape and fell. After the accident, Hunter began complaining of problems in his knee and back.

LIABILITY
LSA-R.S. 9:2800.6, as enacted by Acts 1988, No. 714, provides:
"§ 2800.6. Liability of a merchant for injuries sustained by a person while on the premises of the merchant
"A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
"B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.

*840 "C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
"D. `Merchant' means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business."
It is apparent that the jury found that Hunter proved the accident was caused by a hazardous condition since it attributed 10% fault to Kroger's. In reviewing the jury's findings, we must follow the manifest error-clearly wrong rule. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Mr. Hunter testified that he slipped on a grape in Kroger's and fell. Mrs. Hunter testified that she saw crushed grape on her husband's shoe. Crisita Lewis, the cashier at the check-out stand at which Mrs. Hunter was paying for the groceries, testified that she did not see but did hear Hunter fall. Lewis then saw Hunter down on one knee. Lewis testified that she saw at least one and possibly three crushed grapes on the floor. Bill Dugas, the co-manager on duty the evening of the accident, testified that he saw mashed grape on the floor at the scene of the accident.
In light of the foregoing, we do not find that the jury erred in finding that Hunter met his burden of proving the accident was caused by a hazardous condition. In holding Kroger's 10% at fault, it is also evident that the jury found that Kroger's did not exculpate itself from liability by proving it acted in a reasonably prudent manner to keep its premises free of this hazardous condition. However, Kroger's did not answer this appeal requesting a review of the jury's finding of liability on Kroger's part. Accordingly, we will not review the jury's finding concerning Kroger's failure to exculpate itself from liability by failing to prove that it acted in a reasonably prudent manner. We engage in a discussion of whether Hunter proved the accident was caused by a hazardous condition on Kroger's premises since it is necessary to the review in this case of the jury's finding of fault on behalf of Hunter.
By attributing 90% of the fault in the accident to Hunter, the jury evidently found that Hunter was partially responsible for his fall. Apparently, the jury found that Hunter was negligent in failing to use crutches or a cane at the time of the accident, or in failing to see the grape or avoid it if he had observed it.
We are mindful that the appellate court may not disturb the jury's findings absent manifest error. However, concerning Hunter's failure to use crutches or a cane, the jury's finding of negligence on Hunter's part is not supported by the record since the record contains no evidence that this failure was a cause-in-fact of the accident. Nettles v. Winn-Dixie Louisiana, Inc., 496 So.2d 1296 (La.App. 3d Cir.1986).
It is undisputed that Dr. Foret prescribed the use of crutches for Hunter following the surgery, and that Hunter was not using either crutches or a cane at the time of the accident. Hunter testified in deposition that Dr. Foret told him a couple of days prior to the accident to discontinue using crutches. There are discrepancies within Hunter's own testimony as to whether Dr. Foret told him to use a cane.
In any event, even assuming Hunter had a duty to use crutches or a cane, there is no evidence that Hunter's failure to use a supportive device contributed in any way to the fall. There is no evidence to suggest that a person without knee problems would not have slipped on the grape. We note that if the jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced it would have weighed the evidence differently. Rosell, supra. In the absence of evidence to support a *841 finding, overturning the finding does not violate the manifest error rule.
If the jury found that Hunter fell because his knee "buckled", an apportionment of fault to Kroger's would have been inappropriate since the fall could not have been caused by a hazardous condition on the premises, but rather by the condition of Hunter's knee. Even so, there was no showing that the fall was due to Hunter's knee condition.
Nettles v. Winn-Dixie Louisiana, Inc., supra involved a similar situation. In that case, the plaintiff suffered from a severe hip disorder which caused him pain and weakened his ambulatory abilities. In contravention of his doctor's advice, plaintiff proceeded to push a shopping cart in the defendant's store without his prescribed crutches. He used a walking cane that day, but deposited it in the shopping cart while he shopped. While walking down an aisle in the produce section, the plaintiff stepped on a grape and slipped. The jury found plaintiff 65% contributorily at fault in causing his own fall.
This court found manifest error in the jury's apportionment of fault, determining that the plaintiff was not at fault at all in causing his injuries. We stated:
"The jury found Mr. Nettle's preexisting hip condition significant and his doctor's recommendation to use crutches compelling. The jury apparently found that a crutched-plaintiff would have been a more formidable combatant against the grape. We must defer to the fact finder's discretion unless we find clear error. The record does not support the finding of fault on behalf of plaintiff. Plaintiff testified that he used the buggy for support and balance. The crutches were to be used until plaintiff `got more strength in his legs,' as Dr. Larriviere pointed out. There was no showing that plaintiff fell out of weakness or lack of strength in his legs for which the crutches were suggested. To the contrary, plaintiff fell because he slipped on a foreign substance resting on defendant's floor. The jury manifestly erred in finding fault with plaintiff's behavior.
"Furthermore, even if we agreed that plaintiff was somehow negligent in failing to use crutches, this negligence was not a cause-in-fact of the accident. `A plaintiff's negligence will not reduce the amount of recovery unless it was a cause-in-fact of the accident.' Sons v. Commercial Union Assurance Companies, 433 So.2d 842, 845 (La.App.3d Cir. 1983). If the accident would have occurred irrespective of plaintiff's negligence, then it was not a cause-in-fact of the injury. Breithaupt v. Sellers, 390 So.2d 870 (La.1980). We conclude that defendant has not met its burden of showing that Mr. Nettles' failure to use crutches was a cause-in-fact of the slip and fall. We find that the sole intervening cause of the accident was defendant's lack of protective measures which allowed plaintiff to step on the grape. To correct the jury's clear error, we reduce the percentage of plaintiff's negligence to zero."
496 So.2d at page 1300.
Furthermore, the record does not support a finding that Hunter failed to see what he should have seen. Testimony at trial revealed that one to three crushed grapes were found at the scene of the accident. As in Nettles, supra, the flooring at Kroger's blended with the color of the grapes.
Finally, Hunter testified that he did not see the grape before he slipped on it, and there is no evidence to suggest otherwise.
Accordingly, we reverse the jury's apportionment of fault to Hunter and reduce his fault to zero.

EVIDENCE
During the trial, Larry Chronister, Hunter's former supervisor, testified concerning a conversation he had with Hunter about rehiring Hunter following the accident. Chronister stated:
"All right. Phil came in. I told him that, you know, we had to make a decision as to what we were going to do and in conjunction with going back to work I asked him what his doctor had told him about going back to work. His answer was my lawyer told me that if I go back *842 to work, I might get about twenty thousand. If I don't, I should get a hundred seventy-five to two hundred thousand."

(Emphasis added)
Hunter's attorney objected at trial to the statement, contending that it was double hearsay. Hunter's attorney at trial was not the attorney who allegedly made the statement to Hunter.
The trial court overruled the objection, determining that the statement was not hearsay. We agree.
LCE art. 801(C) provides:
"`Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted."
Hunter's statement was not offered to prove that Hunter's attorney actually made the statement or to prove the value of the case. Rather, the statement was offered to prove that Hunter made the statement to Chronister. As such, it was not hearsay.

QUANTUM
The jury awarded Hunter $40,000 in damages without specifying which portion of the award, if any, constituted past and future loss of earnings, past and future medical expenses, and pain and suffering. Furthermore, the jury verdict sheet does not reveal whether the award is for the alleged back injury or knee injury or both. In any event, it is evident that the jury found that Hunter sustained injury in the slip and fall since it awarded him $40,000.
The record reveals the following concerning the alleged back injury. Hunter testified that he began experiencing pain in his back on the way home from Kroger's. Hunter stated that he saw Dr. Foret two days after the accident (this appointment had been scheduled prior to the accident), complaining of pain in his knee. Dr. Foret had a CAT scan made of Hunter's back. Hunter testified that Dr. Foret explained that he had a ruptured disc. Dr. Foret was not called to testify at trial, nor did the record contain any deposition of Dr. Foret.
On January 6, 1989, Hunter saw Dr. Clark Gunderson, an orthopedic surgeon. Dr. Gunderson testified that when he saw Hunter, Hunter had knee and back pain. The pain in Hunter's back radiated down to his left leg. Dr. Gunderson found that Hunter had spasm in his back, which is an objective finding. Dr. Gunderson testified that Hunter was limping on his left leg and had limited motion in his back. Hunter also had tenderness in his lower back and buttock region. Dr. Gunderson had x-rays, a myleogram, and a CAT scan made which showed that Hunter had two ruptured discs in his back at the L4-5 level and the L5-S1 level. Dr. Gunderson prescribed physical therapy, but Hunter did not respond to it. On January 26, 1989, Dr. Gunderson performed a laminectomy and discectomy on Hunter, removing two ruptured discs.
Dr. Gunderson stated that Hunter was in the hospital for about four or five days for tests and recovery. The surgery was apparently successful. Dr. Gunderson assigned 20% permanent partial disability to Hunter's body as a whole concerning the back injury.
Dr. Gunderson prescribed medication and physical therapy for Hunter. He discharged Hunter on June 23, 1989. Hunter stated at this time that his back pain was about the same. He stated that he had no leg pain and minimal back pain when he increased his activities.
Dr. Gunderson again saw Hunter on September 12, 1989. At this time, Hunter stated that his back was weak, he would develop pain if he would lift anything, he could not ride on long trips, and he could not mow his yard. Dr. Gunderson saw Hunter again on March 16, 1990, two to three months prior to trial. Hunter stated that he had developed constant pain in his lower back.
Dr. Gunderson ordered an MRI which revealed that Hunter had a repeat ruptured disc at L5-S1. He recommended another laminectomy and discectomy.
Hunter testified that he had never had trouble with his back prior to the accident, except for pulled muscles and back pain diagnosed as acute prostatitis.
*843 Dr. Gunderson stated that it was probable that the difficulties in Hunter's back and knee resulted from the trauma of the slip and fall. However, Dr. Gunderson also stated that the condition in Hunter's back did not necessarily require trauma to become symptomatic.
A plaintiff's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, provided that the medical evidence establishes a reasonable possibility of causal connection between the accident and the disabling condition. Housley v. Cerise, 579 So.2d 973 (La.1991); Lucas v. Insurance Co. at North America, 342 So.2d 591 (La.1977).
While a ruptured disc does not necessarily become symptomatic because of trauma, the record supports that the slip and fall caused the ruptured disc. Prior to the accident, Hunter had no history of significant back trouble; immediately following the fall, he began experiencing back pain. A little over a month after the accident he was diagnosed as having two ruptured discs. Dr. Gunderson was of the opinion that the difficulties Hunter experienced with his back resulted from the accident. We find that the record supports a finding that Hunter's back condition resulted from the slip and fall accident.
Concerning the knee injury, the record reveals the following. Hunter testified that prior to his knee surgery on November 21, 1988, his knee began swelling and hurting "about a month or twoabout two or three weeks before I went to see [Dr. Foret]." When asked whether anything particular happened that caused his knee to start bothering him, Hunter replied "[W]ell, I helped some guys put a roof on my house and did a lot of squatting, but he said I evidently had another injury before that I didn't remember having."
Dr. Foret performed an arthroscopy on Hunter's knee on November 21, 1988. As noted above, the record does not reveal that Dr. Foret testified in these proceedings. However, according to Dr. David Drez, the orthopedist who treated Hunter for his knee problems after the accident, Dr. Foret's records showed that Hunter had an arthritic condition in his knee and a tear in his meniscus. These records state that Dr. Foret removed fragments from Hunter's knee and performed a meniscectomy.
Hunter testified that following this surgery and before the slip and fall, his knee "was doing pretty good. I was walking." When asked if he was walking with a limp, Hunter stated "[y]eah, it was still a little touchy." Hunter testified that the swelling in his knee following the surgery had been decreasing before the accident, but began swelling again after the accident.
Shortly after the accident, Hunter discontinued consultation and treatment with Dr. Foret. In April 1989, Hunter began seeing Dr. Drez. Dr. Drez conducted a physical exam of Hunter and found limited motion in Hunter's left knee joint, pain about the patella area with a grind or crepitus, and grinding and clicking in the inner aspect of the knee with pain on performing certain maneuvers.
Dr. Drez also requested x-rays of Hunter's knee which were taken by Dr. Gunderson in January of 1989. The x-rays showed evidence of mild arthritis in the left knee joint. Dr. Drez testified that after the examination he wasn't exactly sure of the etiology of Hunter's complaints.
Dr. Drez performed an arthroscopy on Hunter on June 27, 1989 and discovered a tear in the cartilage of Hunter's knee as well as arthritic changes in the knee joint.
Dr. Drez testified that the tear he had observed would have been an additional tear following the November 1988 surgery. Dr. Drez testified that a tear can occur with any single incident of trauma or over a prolonged period. Dr. Drez was questioned as follows by Kroger's counsel:
"Q And, Dr. Drez, have you also seen a lot of patients that come in and say that they twisted their knee dancing or getting up to answer the phone or anything as trivial as that? It doesn't *844 have to [sic] a fall or some direct trauma.
A It does not.
Q Are you able to say with any medical reasonable certainty that the tear that you saw later of the meniscus of Mr. Hunter was more probably resulting from a misstep on the dance floor or some fall that happened four months before?
A No, I can't say, and in looking at the lesion and knowing whendating it, I can't do that. The way that we do those sort of things is all we do is take a history from someone and ask them when their symptoms began and what precipitated their symptoms, and that's the way I relate back to that.
Q And, Dr. Drez, when you take that history, of course, you're relying on the accuracy of the patient and the way he tells it to you and his truthfulness.
A Correct."
When questioned by Hunter's counsel as to whether he felt the additional tear would probably have been caused by the slip and fall accident, Dr. Drez replied "[w]e had an interval where he washe had no symptoms with his knee, and then he had a symptomatichad an injury or some type of twisting. So it could be compatible with another injury that produced the tear." Additionally, Dr. Gunderson, who examined Hunter's knee when Hunter first consulted him concerning his back problems, testified as follows:
"Q Doctor, after your examination, operations, treatment of this patient over this extended period of time, and after your review of the notes that you got and obtained from Dr. Lynn Foret, do you feel that it's probable that the difficulties that this man has had with his back since December 11th of 1988, fall at the grocery store and the problems that he's had with his knee since that time are as a result of the trauma that he experienced on that date?
A Yes."
Dr. Drez did not repair the meniscus tear when he performed surgery on Hunter on June 27, 1989, but he did remove torn fragments from Hunter's knee. Dr. Drez testified that loose fragments on the surface of the joint resulted from arthritis, which is a degenerative and progressive condition. Dr. Drez testified that arthritis can be rendered symptomatic as a result of trauma, and that it was highly likely that trauma probably aggravated and rendered symptomatic Hunter's arthritic condition. Dr. Drez testified that arthritis can be brought on by one traumatic episode which rendered it symptomatic, or it can be a preexisting condition in which trauma makes it symptomatic. Dr. Drez did testify that based on Dr. Foret's notes, Hunter would have had the arthritic condition prior to the fall.
Dr. Drez assigned 30% partial permanent disability to Hunter's left lower extremity. He recommended additional surgery, a tibial osteotomy, to reduce the symptoms, but not the disability, associated with Hunter's knee.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the accident and the injuries complained of. It is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Where defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991).
We find that the record supports the finding that a meniscus tear and an aggravation of the preexisting arthritic condition associated with Hunter's knee were sustained in the fall. Hunter is entitled to recover damages flowing from the back and knee injuries.

Pain and Suffering
Hunter's injuries and disability are described above. Dr. Gunderson testified that he saw Hunter on September 12, 1989, and that Hunter stated his back was weak, *845 he developed back pain upon lifting things, he could not ride on long trips, and could not mow his yard. Dr. Gunderson stated that he would not advise Hunter to engage in any occupation or recreation that involved prolonged standing, walking, running, squatting, kneeling, or sitting with his knee in a flexed position. He stated that Hunter could probably lift things up to twenty pounds, but could not climb, crawl, or do anything with repetitive bending. Dr. Gunderson testified that Hunter would have to alternate between sitting and standing. Dr. Gunderson did feel however, that Hunter could do lighter, sedentary type labor and activities.
Dr. Drez testified that weight bearing activities would produce discomfort in Hunter's knee, such as climbing, running, squatting, kneeling, or walking for any distance, and that he informed Hunter not to engage in any type occupation or recreation that involved prolonged standing, walking, running, squatting, kneeling or sitting with his knee in a flexed position for a prolonged time. He stated that the patient would be "bowlegged" because of his knee problem.
While the record contains evidence that Hunter did take long trips and worked after the accident, Hunter is still restricted in the activities in which he can participate.
Because interrogatories in the verdict sheet did not permit the jury to itemize its $40,000 lump sum award, we are left at a disadvantage in considering the adequacy of the award for all elements of plaintiff's damages. Under the circumstances we must of necessity engage in some fact-finding in order to resolve the problem. See Vice v. Aetna Cas. and Sur. Co., 535 So.2d 1275 (La.App. 3d Cir.1988). In our view, at the very least, the jury would have been bound to find that Hunter incurred at least $17,000 in past medical expenses and some amount for pain and suffering. Assuming that the jury allowed no other elements of damage, this would mean that the jury allowed only approximately $23,000 for pain and suffering. If any other special damages were included, then the general damage award would be commensurately decreased. The sum of $23,000 is far below the minimum the jury reasonable could have awarded for Hunter's back and knee injuries. Considering the articulated analysis of facts and circumstances of this case recited above, it is our opinion that the jury clearly abused its much discretion in fixing Hunter's damages for pain and suffering. Therefore, we may consult the mass of quantum awards and fix the damages at the lowest amount which the jury could have awarded. We find the lowest award for pain and suffering reasonably within the jury's discretion was $120,000.

Medical Expenses
Hunter claims past medical expenses in the amount of $17,732.38. Hunter filed the following itemization of medical expenses into evidence:

List of Medical Bills:
Diagnostic Imaging $ 700.00
Diagnostic Radiology $ 455.35
Radiology, Inc. $ 142.00
Orthopeadic Sports Clinic $ 6732.23
Dr. John T. Foret $ 84.00
Dr. William Foster $ 75.00
L.C. Anesthesiology $ 823.00
L.C. Memorial Hospital $ 6781.80
Rehab Services of L.C. $ 1080.00
Dr. Fayez Shamieh $ 260.00
Dr. A.L. Cook $ 224.00
C.T. Imaging $ 375.00
 _________
 TOTAL $17732.38

Kroger's has neither stipulated to nor contested this amount.
We note the following discrepancies between Hunter's listing and the actual bills filed into evidence. Diagnostic Radiology Associate's bills reflect charges in the amount of $478.75, rather than $455.35 as asserted by Hunter. Additionally, while Radiology, Inc.'s bills reflect charges of $142, $22 of that amount represents expenses incurred prior to Hunter's slip and fall. Hunter lists charges of $6,732.23 from the Orthopedic and Sports Injury Clinic. However, $510 of that amount represents charges for narrative reports, conference, and other related services apparently incurred for litigation purposes. Such expenses are not items of damage and *846 cannot be awarded as such. Alexander v. Fidelity-Phoenix Insurance Company, 185 So.2d 102 (La.App. 4th Cir.1966); Rose v. Winn-Dixie Louisiana, Inc., 474 So.2d 26 (La.App. 4th Cir.1985). Finally, Hunter lists charges of $224 for Dr. A.L. Cook. The record reflects charges of $139 for Dr. Cook's services. Accordingly, we amend the award for Hunter's past medical expenses to $17,138.78, the amount supported by the medical bills.
Hunter contends that he is entitled to future medical expenses in the amount of $17,732.38, based on the testimony of Drs. Gunderson and Drez. In view of the low lump sum jury award, and applying the considerations we described above, we might speculate that the jury felt that Hunter was not entitled to an award for future medical expenses.
Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable cost. Durkee v. City of Shreveport, 587 So.2d 722 (La.App.2d Cir.), writ denied, 590 So.2d 68 (La.1991). Drs. Gunderson and Drez both testified at trial concerning future medical expenses. Dr. Gunderson testified that he saw Hunter on March 16, 1990. Hunter stated that he had developed more pain in his lower back. On March 27, 1990, Dr. Gunderson had an MRI performed on Hunter, which revealed that Hunter had a repeat ruptured disc at L5-S1. Dr. Gunderson proposed that another laminectomy and discectomy be performed. Dr. Gunderson testified that the surgery involved would be of the same type Dr. Gunderson had previously performed on Hunter, and that the surgery and medical bills associated with the surgery would be approximately the same as incurred in Hunter's previous surgery.
The only testimony in the record that contradicts Dr. Gunderson's testimony is that of Dr. Gerald Litel. At the request of Kroger's, Hunter was examined by Dr. Litel, a neurosurgeon, on March 14, 1990. Dr. Litel's examination revealed that there was not a great deal of spasm in Hunter's back. He opined that there were no ongoing neurological problems, and that Hunter did not have a repeat ruptured disc.
It is well settled that the testimony of an attending physician should be accorded more weight and probative value than that of a physician who has made an examination solely for the purpose of giving expert testimony regarding a patient's condition. Streeter v. Sears, Roebuck and Company, Inc., 533 So.2d 54 (La.App.3d Cir.1988), writ denied, 536 So.2d 1255 (La. 1989). Furthermore, Dr. Litel examined Hunter on only one occasion. Dr. Litel spent approximately thirty minutes with Hunter and did not perform a CAT scan, MRI, myelogram, or x-rays. In light of Dr. Gunderson's findings and testimony regarding the probable cost of future surgery and medical expenses, Hunter is entitled to an award for future medicals for his back surgery.
We note that at the time of the trial, Hunter had not yet elected to undergo surgery. However, since surgery is indicated in this case, we find Hunter is entitled to an award for future medical expenses. See Huval v. Sinitiere, 376 So.2d 548 (La.App. 3d Cir.1979); Wyble v. Allstate Insurance Company, 581 So.2d 325 (La.App. 3d Cir.1991).
Concerning Hunter's knee injury, Dr. Drez testified that Hunter's symptoms, but not his disability, could be reduced by a tibial osteotomy. He saw Hunter on April 4, 1990, and found no change from previous exams. Dr. Drez testified that because of his knee problem, Hunter is now bowlegged. He stated that the surgery would change the bowleg to a straight or slightly knock-kneed condition so that the weight bearing line would be transferred to the compartment of his knee which is not arthritic.
Dr. Drez testified that Hunter informed him that he was not interested in trying to pursue any type of further operative treatment. Therefore, Dr. Drez recommended the use of shoe inserts to change the load distribution across Hunter's knee joint. However, at trial, Hunter testified that he *847 intended to undergo surgery on his back and knee.
In light of testimony by Drs. Gunderson and Drez that the problems with Hunter's knee were probably caused by the trauma of the slip and fall, and in light of Dr. Drez's recommendation for future surgery and Hunter's testimony at trial that he intends to undergo that surgery, we find that Hunter is entitled to an award for future medical expenses associated with his knee condition. Dr. Drez testified at trial that the cost of the surgery should be approximately the same as the cost of the previous arthroscopy he performed on Hunter. Dr. Drez stated that the cost of the medical bills associated with the tibial osteotomy would be a bit more expensive because the tibial osteotomy would not be an outpatient procedure. We find that the record supports an award of $15,000 for future medical expenses.

Loss of Earnings
Hunter contends that he sustained past loss of earnings in the amount of $36,939 and future loss of earnings in at least the amount of $127,530. Based on the $40,000 jury verdict, it is obvious that the jury found that Hunter failed to prove loss of earnings in this amount if in fact it found any loss at all. If the jury failed to award loss of earnings such failure was not manifestly erroneous.
Dr. Charles Bettinger, an expert in statistics and economics, testified concerning the amount of past and future loss of earnings incurred by Hunter based on information given to him. Jeffrey Peterson, a vocational specialists, testified concerning Hunter's potential for employment. Based on information he obtained from Hunter's physicians and his own interview and testing of Hunter, Peterson opined that Hunter was 95% to 100% unemployable.
Despite this testimony, the jury chose to deny damages to Hunter for loss of earnings. It is the plaintiff's burden of proving that his disability will cause him to suffer a lack of income. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La. App. 2d Cir.1987).
Concerning Hunter's disability, Dr. Gunderson stated that he thought Hunter could do sedentary type labor, when questioned as to whether he thought Hunter was physically disabled from working. Dr. Drez testified that he would not discourage Hunter from engaging in light sales, light activities, and making office calls on offices without carrying anything.
Hunter testified at trial that he had not had a regular job since the accident in December of 1988. However, the jury could reasonably have concluded that Hunter was engaging in such activity.
Hunter testified in deposition that prior to the accident, he was employed in outside sales by Hunter Business Machines, of which he owned a percentage, and was paid on a commission basis. Hunter's supervisor at this time, Larry Chronister, testified that the last commission payment to Hunter was recorded on January 17, 1989. Chronister testified that this could have been earned six weeks, a month, or days prior to that date.
Hunter stated that after the accident, he worked with Bessette Contractors recruiting customers and calling on accounts for the company for approximately two months. Hunter entered into an independent contractor agreement with the company on March 23, 1989. The record contains a "1099-Misc." tax form showing compensation in the amount of $1,681.09. The record also contains a letter from the company's president to Kroger's attorney stating that the $1681.09 represents advances on commissions, but that no actual commissions were earned.
Hunter also testified that after the accident, he made some trips to Cameron to see customers for his son, Lanny Hunter, who owns H & H Office Machines.
Lanny Hunter opened this business in August 1989. Hunter testified that "H & H" does not stand for "Hunter and Hunter", and that he does not own an interest in the business. However, the H & H business cards contain the following:
*848 
In deposition, Hunter stated that he went to his son's office just about every day, but was not being paid except for his expenses; at trial, Hunter stated that he was going to his son's office two or three times a week. He stated that he had obtained sales and occasionally delivered equipment for his son. Hunter admitted calling on Cameron State Bank, Cameron Clerk of Court, Cameron Parish Police Jury, and Hebert Land Title and informing them that he would be there every Wednesday if they needed anything.
Lanny Hunter testified that his father owned no part of the business and just received expenses for helping him. He stated that Hunter visited customers for him in Cameron Parish and Lake Charles. Lanny Hunter stated that his father's name was on the business cards because people were familiar with his father's name since he had been in the business for "fifteen, twenty, twenty-five years."
Additionally, Hunter was involved in the Army Reserve. He stated that he reports for a two day session once a month but does not have to do physical training or maneuvers because of this physical condition. Hunter stated that he had been to Savannah, Georgia two to three weeks prior to trial performing administrative duties for a two week period.
Finally, Chronister, who owns W.L. Chronister Company, testified that in March 1989, he called Hunter to talk about rehiring him. Hunter went to see Chronister, and Chronister testified that Hunter told Chronister that his attorney said that if Hunter went back to work he might get $20,000 and if he did not, he should get around $175,000 to $200,000. Chronister stated that Hunter asked him if he could work on a commission basis and have Chronister pay his son, Lanny Hunter. Chronister refused this suggestion.
Chronister is a competitor of Lanny Hunter and presently owns all of the stock of Hunter Business Machines. However, he stated that he did not give this information to Kroger's counsel voluntarily, but in response to Kroger's subpoena and questions.
Hunter testified that he told Chronister that he could not return to work because his doctor had not released him. Hunter also testified that he did not tell Chronister that his attorney told him that the case was worth $20,000 to $200,000.
The jury could reasonably have concluded that Hunter was able to work or was actually working in his regular field of selling business machines. In light of the foregoing evidence, we conclude that Hunter failed to prove by a preponderance of the evidence that he sustained damages for loss of earnings.

DISPOSITION
We reverse the jury's finding of 90% fault on Hunter's behalf and reduce his fault to zero. We amend the jury's award to reflect damages for pain and suffering in the amount of $120,000, past medicals in the amount of $17,138.78, and future medicals in the amount of $15,000. We affirm the judgment in all other respects.
REVERSED IN PART: AFFIRMED IN PART, AMENDED and RENDERED AS AFFIRMED.
NOTES
[*] Honorable John A. Patin participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.