637 So.2d 1177 (1994)
Deanna SMITH, et al.
v.
The LOUISIANA HEALTH AND HUMAN RESOURCES ADMINISTRATION, et al.
No. 93-CA-1434.
Court of Appeal of Louisiana, Fourth Circuit.
May 18, 1994.
*1179 Darleen M. Jacobs, James L. Yates, Darleen M. Jacobs, A Professional Law Corp., New Orleans, for plaintiffs.
Richard Ieyoub, Atty. Gen., Ivor A. Trapolin, Miles G. Trapolin, Trapolin Law Firm, Sp. Asst. Attys. Gen., New Orleans, for defendants.
Before CIACCIO, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
Following the death of Harry Smith, a patient at Charity Hospital in New Orleans, his widow and seven children sued the hospital, *1180 the state of Louisiana and a state agency for wrongful death. The plaintiffs prevailed in a bench trial and the trial court awarded Mrs. Smith $325,000.00, six of the seven children $80,000.00 each and one of the children, who is mentally retarded, $100,000.00. The defendants appealed. We affirm.
Harry Smith suffered from a number of cardiac and respiratory illnesses. He was transferred from another hospital to Charity when his medicaid benefits ran out. Mr. Smith was advised to remain in bed and to get out of bed only in order to go to the bathroom. When Mr. Smith exerted himself to a greater extent, his medical condition could cause a shortage of oxygen to his brain, which resulted in confusion and disorientation. While at Charity, Mr. Smith suffered confusion on a number of occasions. On at least three occasions he took off all of his clothes and, on at least two of those occasions, was found wandering the halls of the hospital nude. On another occasion, Mr. Smith, believing himself to be in the bathroom, urinated on the hospital floor. The nursing notes indicate that Mr. Smith was observed to be confused on a number of other occasions as well. On one occasion, Mr. Smith told his wife, who was visiting, that a particular former governor of Louisiana had been in his ward to visit which, of course, was totally incorrect and the result of a hallucination.
Mr. Smith was given medication for treatment of this confusion on at least three occasions. Mr. Smith also was placed in soft restraints at least twice. However, he was not placed in restraints continuously and was not made the subject of continuous observation to prevent him from coming to harm while in a confused state.
On or about November 10, 1983 in the early morning hours, apparently between 1:00 and 2:00 a.m., Mr. Smith left the ward, made his way to the emergency room, and then to the ambulance ramp outside the emergency room. He then drove away in an ambulance in which the keys had been left. While driving the ambulance, he crashed into a construction barricade near his home and was killed.
The trial court found that Mr. Smith most probably took the ambulance while in a confused state. The trial court also found the defendants negligent in failing to keep Mr. Smith restrained or under observation. "This [trial] court cannot escape the conclusion that the hospital could have, and indeed should have, implemented either a vigorous restraint regimen for the patient [Mr. Smith] or an around-the-clock visual observation of this patient." The trial court also found leaving the keys in the ignition to be negligent.
In their first specification of error, the defendants argue that the trial court erred in stating that this is not a medical malpractice case and in stating that the plaintiffs did not need to use expert testimony to prove their case. Specifically, the defendants complain of the following statements of the trial court:
While this is not a medical malpractice action against defendants, applicable case law seems to dictate that the standard of care for hospitals are the same in actions based on negligence, wrongful death, and torts for damages for mental pain and anguish, as in malpractice actions. Keyworth v. Southern Baptist Hospitals, Inc., 524 So.2d 56 (La.App. 4th Cir.1988) writ denied, 525 So.2d 1058 and writ denied, 525 So.2d 1061 (La.1988); Austin v. St. Charles General Hospital, 587 So.2d 742, 746 (La.App. 4th Cir.1991). Thus, in this action for negligence, as in any malpractice action against a hospital, the plaintiffs must prove that Charity owed them a duty to protect against the risk confronting the decedent, that Charity Hospital breached that duty, that plaintiffs suffered an injury through the decedent's death, and that Charity's actions were substantial cause-in-fact of the injury. See Smith v. State Through Dept. of Health and Human Resources Admin., 523 So.2d 815, 819 (La. 1988); Austin, supra. In the execution of this burden of proof by the plaintiffs, the Fourth Circuit Court of Appeal in Austin, supra, declared: "Nevertheless, these cases do not specifically mandate that the plaintiff must prove a breach of duty by the use of expert testimony."
*1181 We suspect that the trial court's statement that this is "not a medical malpractice action" is a reference to the fact that the 1988 amendment to La.R.S. 40:1299.39, making that "medical malpractice" statute applicable to state hospitals and the state, does not apply in this case which arose and was filed in 1983 (a point which will be discussed below). More importantly, the thrust of the trial court's remarks is that the test of liability is the same for this case as in a "medical malpractice" case. As the defendants are arguing that this is a "medical malpractice" case, they obviously have suffered no prejudice from the trial court applying a "medical malpractice" standard for liability.
As to the trial court's quotation of our decision that expert testimony may sometimes not be necessary in a case of alleged hospital negligence, there cannot possibly have been any prejudice to the defendants because, necessary or not, the record is filled with expert testimony. The plaintiffs called as an expert witness a registered nurse, Celia Krebs, who was a former licensed practical nurse at Charity Hospital. Celia Krebs testified at great length and in some detail. In view of the fact that the issues in this case revolve more around nursing care than physician treatment, Ms. Krebs clearly was a well-qualified expert witness. Moreover, several doctors also testified and, although they were called by the defense, their testimony on cross-examination lent support to the plaintiffs in some respects. In short, it makes no difference whether or not the trial court held that expert testimony was "necessary" in this case because there was expert testimony in support of the plaintiff's position and, in fact, the trial court expressly discussed that expert testimony in its reasons for judgment.
In their second specification of error, the defendants argue that the death of Mr. Smith, occurring in the particular manner that it did, was not proximately caused by any breach of duty of the hospital to keep Mr. Smith either under restraint or under continuous observation. We believe that the trial court was correct in finding the failure of the hospital to keep Mr. Smith either under restraint or under continuous observation proximately caused his death despite the unusual manner of his death. (For purposes of this proximate cause specification of error, we will assume the hospital breached a duty it owed to Mr. Smith. Issues of duty and breach will be discussed below in connection with the defendants' seventh and eighth specifications of error.)
The defendants' proximate cause argument boils down to the proposition that it was not foreseeable that Mr. Smith would go to the emergency room ramp and take an ambulance. The defendants might well have added that it was not foreseeable that Mr. Smith would then be killed in a collision in the ambulance. There are two somewhat related reasons why the defendants' proximate cause argument is without merit. First, if some sort of harm is foreseeable, the exact manner of the harm need not be foreseeable. Second, under Louisiana's duty-risk analysis, foreseeability is not in itself determinative, and at times yields to policy considerations in the determination of whether the defendant will be held liable for a particular harm. As will be explained below, the ultimate issue is "ease of association" of the specific actual harm to the breach and/or to foreseeable harms rather than foreseeability per se.
In Forest v. State, Through Louisiana Dept. of Transp. and Development, 493 So.2d 563, 570 (La.1986), a motorist crashed through a road barricade because the barricade had not been marked properly and there was no proper sign warning of the necessary detour. The motorist struck and killed a dismounted bicyclist/pedestrian. The state argued that the death of a bicyclist/pedestrian, as opposed to harm to a motorist, was not foreseeable and was not proximately caused by any failure to mark the barrier properly or to warn of the necessary detour. The Supreme Court rejected that argument:
Whether or not this duty to properly sign and mark highways, to alert unwary drivers to unusually perilous hazards, encompasses the risk of the harm which befell James Forest [the bicyclist/pedestrian] is the next inquiry in a proper duty risk analysis. More simply stated, is the risk *1182 that an unwary driver would crash through an improperly marked barricade and kill a pedestrian encompassed within the duty of the State to make highways safe by the proper use of warning devices?
* * * * * *
"Furthermore, a risk is not excluded from the scope of the duty simply because it is individually unforeseeable. A particular unforeseeable risk may be included if the injury is easily associated with the rule relied upon and with other risk of the same type that are foreseeable and clearly within the ambit of protection." Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080 (La.1982). Even if the risk of a bicyclist's being killed (as he stands in front of a highway barricade) by an oncoming motorist who does not see the barricade is not distinctly foreseeable, his death by this means is easily associated with the violation of DOTD's duty to properly and safely sign the barricade and is like risks of the same type that are clearly within the ambit of protection.
493 So.2d at 570.
In Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080 (La.1982), a motorist, who was accompanied by a child, negligently drove into an underpass that had been flooded by rainwater. Both the motorist and the child drowned. The motorist's automobile liability insurer, which provided coverage only for liability arising from the ownership or use of an automobile, argued that the child was not drowned in the car or its immediate vicinity, but some distance away, and apparently some time after the motorist's initial negligence of driving into the flooded underpass. The Supreme Court held that the child's drowning was proximately caused by the motorist's initial negligence of driving into the flooded underpass.
State Farm does not seriously contest that the duties which Larry Davis breached were imposed to protect against Greta's drowning while inside or near the car. The insurer points out, however, that her body was discovered 300 to 450 feet from the car and that plaintiffs' case is based largely on circumstantial evidence. State Farm contends that it can be reasonably inferred therefore, that Greta's drowning resulted from other risks which should not be included within the scope of the driver's duties. The company argues that Greta could have drowned because she knowingly assumed the risk by walking into deeper water although she knew safety lay a short distance in the opposite direction, or because she negligently failed to take the safer route, or because she was led or forced in the wrong direction by Larry Davis who either negligently or knowingly took her toward the deeper water beneath the underpass where their bodies were found.
* * * * * *
Furthermore, a risk is not excluded from the scope of duty simply because it is individually unforeseeable. A particular unforeseeable risk may be included if the injury is easily associated with the rule relied upon and with other risks of the same type that are foreseeable and clearly within the ambit of protection. Cf. Hill v. Lundin, supra [260 La. 542, 256 So.2d 620 (1972)]. Even if the risk of Greta's poor judgment was unforeseeable, her drowning by this means is easily associated with the rule relied upon and other risks of the same type that are clearly within the ambit of protection. Davis' duty of careful operation was obviously imposed, for example, to protect against the closely related risks that Greta would drown because she panicked and could not get out of the swamped vehicle or because she slipped and fell after disembarking.
For similar reasons, we conclude that the risk that Greta would be led in the wrong direction by Larry Davis is also within the scope of duty. Although this risk may have been individually unforeseeable, it was of a sort easily associated with those against which the duty clearly protects.
423 So.2d at 1085-86. See also Lejuene v. Rayne Branch Hospital, 556 So.2d 559, 568-569 (La.1990) ("We have also said that foreseeability alone cannot be the sole inquiry because all risks are not foreseeable, and some risks that are foreseeable may not be *1183 included because not within the scope of that duty.")
Further, in Louisiana, negligence is determined using the four-pronged duty-risk analysis:
The standard negligence analysis we employ in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Roberts v. Benoit, 605 So.2d 1032, 1041 (La. 1991). Accord Socorro v. City of New Orleans, 579 So.2d 931, 938-39 (La.1991).
The present issue of proximate cause focuses on the fourth inquiry of the scope of the protection of the duty breached.
There is no "rule" for determining the scope of the duty. Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty.
* * * * * *
In short, the scope of protection inquiry asks "whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner."
* * * * * *
In determining the limitation to be placed on liability for a defendant's substandard conducti.e., whether there is a duty-risk relationshipwe have found the proper inquiry to be how easily the risk of inquiry to plaintiff can be associated with the duty sought to be enforced. Hill, supra. Restated, the ease of association inquiry is simply: "How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? ... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." Crowe, supra at 907. Absent an ease of association between the duty breached and the damages sustained, we have found legal fault lacking.
Roberts, 605 So.2d at 1044-45.
The critical test in Louisiana, however, is phrased in terms of "the ease of association" which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?
* * * * * *
[I]t is not necessary that the exact risk encountered be foreseeable[.]
Roberts, supra at 1054-55. See also Weber v. Charity Hospital of Louisiana, 475 So.2d 1047, 1050 (La.1985) (duty imposed on host driver to refrain from causing injury to another by negligent operation of her car encompassed risk that victim's injuries might be worsened by the treatment for those injuries); Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904, 909 (La.1985) (defendant's duty to prevent fire alarm from falsely sounding encompassed risk pregnant woman would experience emotional distress and descend many flights of stairs, causing a premature delivery).
In the present case, although the exact manner in which Mr. Smith came to harm may not have been foreseeable, it was and is obvious that a patient confused and disoriented by lack of oxygen to his brain might come to serious harm while wandering about, or off of, the hospital premises. Indeed, if left to his own devices for a sufficient length of time, it seems quite likely that a person in such a mental state eventually will be hurt or killed. Everyday hazards in and around a hospital in the middle of a major city which would be routinely avoided or coped with by a person in a normal mental state, such as stairs, machinery or traffic, are dire threats to a person in a confused and disoriented mental state such as that which afflicted Mr. Smith.
*1184 While the particular harm that befell Mr. Smith might not have been foreseeable, that harm lay within the scope of the general range of risks to which Mr. Smith was peculiarly subject due to his mental state. The particular harm which befell Mr. Smith, while unusual, is easily enough associated with the failure to keep Mr. Smith either under restraint or under continuous observation. It is also easily associated with other foreseeable harms that could have befallen Mr. Smith, so that it is within the scope of the risk to be protected against by the breached duty. The merits of this issue are not altogether one-sided in favor of the plaintiffs but, on balance, to resolve this issue as we have done is more justifiable than the opposite outcome.
In their third specification of error, the defendants argue that leaving the keys in the ambulance was not a proximate cause of Mr. Smith's death. However, we already have held that the hospital's failure to keep Mr. Smith either under restraint or under continuous observation was a proximate cause of Mr. Smith's death. Consequently, even assuming that the hospital's leaving the keys in the ambulance was not a proximate cause of his death, such a holding would not result in a reversal or a modification of the trial court's judgment. Therefore, we need not decide this specification of error.
In their fourth, fifth and sixth specifications of error, the defendants challenge the trial court's factual finding that, at the time Mr. Smith left the hospital and took the ambulance, he was in a confused and disoriented mental state. Basically, the defendants argue that Mr. Smith could not have gone from his ward to the emergency room, then out to the emergency room ramp, and then have taken the ambulance if he was in a confused and disoriented mental state. The defendants buttress this argument by pointing to the medical records showing instances of lucidity of Mr. Smith while at the hospital as evidence that he was not continuously confused and disoriented. The plaintiffs counter this by conceding that, while Mr. Smith was not continuously confused while at the hospital, he was often confused during the days prior to his death. The record does show that Mr. Smith was often, although not continuously, confused during his stay at the hospital. This is shown by both eyewitness' testimony and the hospital's own medical records as to Mr. Smith. In fact, Mr. Smith was put in restraints on more than one occasion, was treated with medication for confusion on more than one occasion and restraints were ordered used on an as-needed basis as determined by the nursing staff.
The testimony of the plaintiffs' expert witness was that Mr. Smith was in a confused mental state when he took the ambulance although, of course, this was at least partially disputed by defense expert testimony. The trial court found as follows on this issue of fact:
Moreover, by the defendants' own account, Mr. Smith was frequently in-and-out of various stages of confusion, disorientation, and hostility during his eight-day stay at the hospital. In fact, Mrs. Prechac noted in the "Attachment" of her November 17, 1983 letter to Dr. Wilson Newman, III, that between November 7th through the 9th, the patient stripped his clothing in the hallway on several occasions, suffered disorientation on numerous occasions, failed continuously to abide to the bedrest orders, broke his restraints and continuously removed EKG pads, cardiac and oxygen monitors, and experienced numerous episodes of combative and hostile behaviors. Plaintiffs' Exh. P1.
Charity attempts to deflect these concerns by arguing that Harry Smith was merely a willful, non-compliant patient who was "acting-out" so that he could go home sooner. The court finds this argument untenable and totally unconvincing in light of the strong evidence that Mr. Smith was not only disorientated and confused much of the time, but may have been suffering from a diminished mental capacity due to his chronic disease. See Dr. Colcolough's testimony. Likewise, Mrs. Francois, the Clinical Charge Nurse, expressly stated that when she saw Mr. Smith on the evening of November 9th, or early morning of the 10th, his physical appearance suggested to her that he was in need of a psychiatric *1185 examination. Plaintiffs' Exh. P15 at pp. 9-12 (line 9).
* * * * * *
In defense of the hospital's ambulance policy, defendants argue that Mr. Smith was alert and in full control of his mental faculties when he eluded the hospital staff and stole the ambulance, and that therefore, he should be accorded no more rights than a common thief. This argument is rebuffed on several grounds. Testimony that exertion by Harry Smith caused him shortness of breath and overexertion reduced the necessary oxygen to his brains, thus, causing confusion or disorientation was uncontroverted. Indeed, Dr. Diket testified that he was surprised that Mr. Smith made it to the emergency area from the 5th floor; that he thought him incapable of such actions. The doctor went on to state that Mr. Smith probably was not fully alert when he was out of bed walking around, and that when oxygen insufficiency occurred, bazaar [sic] behavior could ensue. Particularly, since Dr. Diket was Harry Smith's attending physician, greater weight and probative value is accorded to his testimony on this point than to that of Dr. Cook, whose examination was solely for the purpose of giving expert testimony regarding Mr. Smith's conditions. See Hunter v. Kroger Co., 600 So.2d 837 (La. App.3rd Cir., 1992). This testimony coupled with overwhelming documentary evidence that Harry Smith was confused and disoriented much of the time at the hospital convinces the court that Mr. Smith probably was not fully conscious of his actions, but was more probable than not mentally impaired, when he absconded with the ambulance.
* * * * * *
Defendants further contend that the facts in this matter affirmatively show that the sole and proximate cause of Mr. Smith's death was due to his contributory negligence. This argument is premised on the fact that Mr. Smith was oriented and cognizant of his actions at the time he made-off with the ambulance. Having previously repudiated this premise, elaboration here is unnecessary. It suffices to state that the testimony and evidence on the whole preponderates that Harry Smith was constantly confused and disorientated throughout his stay at Charity.
We review these findings of fact by the trial court only to determine whether they are "manifestly erroneous" or "clearly wrong" in light of the record.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La. 1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. Esco, 549 So.2d 840 (La.1989); Arceneaux v. Dominique, 365 So.2d 1330 (La.1978). However, where *1186 documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

Stobart v. State, Through Dept. of Transportation and Development, 617 So.2d 880, 882-83 (La.1993).
Applying the standard of review set out in the above-quoted passage from Stobart, it is clear that the trial court's findings of fact as to Mr. Smith's mental state cannot be found to be "manifestly erroneous" or "clearly wrong". It is not possible to know for certain exactly what was Mr. Smith's mental state at some specific time. But, the trial court found that more probably than not Mr. Smith was confused and disoriented when he left the hospital and took the ambulance, and this view of the evidence was a reasonable one.
In their seventh and eighth specifications of error, the defendants argue that the duty of care to Mr. Smith was not breached because it was not necessary to either keep Mr. Smith in restraints or to subject him to twenty-four hour a day observation. However, the plaintiffs' expert witness testified that proper care required that Mr. Smith be kept under twenty-four hour observation because of his repeated episodes of confusion. The defendants' expert witnesses testified that, because Mr. Smith's confusion occurred "only" when he over exerted himself, twenty-four hour a day observation was not needed. The defendants' experts also testified that the only way to insure twenty-four hour a day observation of Mr. Smith was to have a nurse at his bedside.
The trial court found as a matter of fact that the hospital did not take adequate precautions to protect Mr. Smith in light of his episodes of confusion. In particular, the trial court held:
The doctor's order on November 7, 1983 for "soft restraints PRN" meaning, according to Mrs. Prechac, "as necessary by the nurses" simply does not discharge the hospital's duty to implement extra precautionary measures necessary to protect Mr. Smith. This court cannot escape the conclusion that the hospital could have, and indeed should have, implemented either a vigorous restraint regiment for the patient or an around-the-clock visual observation of this patient. To merely lament that a lack of adequate nursing personnel existed as a defense to the hospital discharging its duty is at best reliance on a fatuous notionone this court totally rejects.
We review these findings of fact by the trial court, with reference to the above-quoted passage from the Supreme Court's Stobart opinion, to determine whether the trial court was "manifestly erroneous" or "clearly wrong" in light of the record.
It is clear that the trial court's findings of fact were reasonable. In the first place, there was a conflict between the plaintiffs' expert witness and the defendants' expert witness as to what needed to be done so as to constitute proper care. This is exactly the sort of credibility determination that is primarily the responsibility of the trial court. *1187 Moreover, the testimony of the defendants' expert witnesses has a couple of weaknesses. It would not have been necessary to assign a nurse or other professionally trained person to watch Mr. Smith to maintain the "around-the-clock visual observation" called for by the trial court. Almost anyone, with almost no qualifications other than general attentiveness, could have been assigned to watch Mr. Smith with instructions to notify the nursing staff or to call security if Mr. Smith left the area of his ward. Also, once there had been repeated episodes of Mr. Smith leaving his ward and becoming confused, just the common sense of a reasonable lay person (as opposed to a medical professional) would strongly militate in favor of continuous observation of Mr. Smith. See generally Galloway v. Baton Rouge General Hospital, 602 So.2d 1003, 1008 (La.1992) ("It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control.") (quoting Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974). Accord Keyworth v. Southern Baptist Hospital, 524 So.2d 56, 58 (La.App. 4th Cir.) (same quote from Hunt), writ denied, 525 So.2d 1058, 1061 (La.1988).
In their ninth specification of error, the defendants complain that the trial court allowed into evidence, over their objections of hearsay, a Charity Hospital internal investigative report of Mr. Smith's death, written statements of several Charity employees made shortly after Mr. Smith's death and reports of Charity Hospital police officers regarding Mr. Smith's death. As to the internal investigation report, the defendants also argue that it is privileged.
We turn first to the hearsay issue. None of the objected-to documents constitute hearsay. Each of them was written and signed by a Charity Hospital employee pursuant to that employee's employment at Charity and each regards matters that were within that employee's scope of employment. Some of the documents relate statements by other persons but, in each case, those persons are also Charity Hospital employees and the related statements were made pursuant to and with regard to the employment at Charity of those other persons.
The Louisiana Code of Evidence provides that a statement is not hearsay if the statement is offered against a party and the statement is: "a statement by an agent or employee of the party against whom it is offered, concerning a matter within the scope of his agency or employment, made during the existence of the relationship". La.Code of Evid. art. 801(D)(3)(a). There is no dispute that the objected-to statements were made by Charity Hospital employees and concerned matters within the scope of their employment and were made during their employment. Therefore, they are not hearsay. Hoffman v. Schwegmann Giant Super Markets, Inc., 572 So.2d 825, 826 (La.App. 4th Cir.1990) (applying Article 801(D)(3)(a), writ denied, 576 So.2d 33 (La.1991).
As to whether the internal investigation report is privileged, this issue previously has been decided adversely to the defendants by the Louisiana Supreme Court and then by this court. The defendants argued to the trial court, in opposition to a pretrial motion to compel production of documents, that the internal investigation report (and certain other documents) were privileged under La.R.S. 13:3715.3(A) and La.R.S. 44:7(D) but the June 3, 1985 judgment of the trial court compelled production:
When, after hearing the law and evidence, the Court decided this matter in favor of plaintiff for reasons orally assigned.
IT IS ORDERED, ADJUDGED AND DECREED, that the defendants are ordered to produce to the plaintiff within ten (10) days from the signing of this order, the following documents:
a.) Any and all incident reports concerning the incident complained of in this lawsuit;
b.) Any and all statements of any and all witnesses and/or nurses, physicians and security employees whose statements were taken within twenty-four (24) hours following the incident complained of.
The defendants then applied to this court for supervisory writs to review the June 3, 1985 *1188 judgment of the trial court and were successful. This court's August 29, 1985 decision in number C-4300 stated:
Writ Granted
Under La.R.S. 44:7C the charts, records, reports, documents and other memoranda prepared by physicians, surgeons, psychiatrists, nurses and employees in public hospitals of Louisiana which indicate the past or present condition, sickness or disease of patients (R.S. 44:7A) or relevant in any judicial proceeding shall be subject to discovery, subpoena and introduction into evidence. However, the records and proceedings of a public hospital committee are confidential, not considered public records, and not available for subpoena under La. R.S. 44:7D. Only the incident reports and statements generated and/or requested by the Charity Hospital Incident Review Committee or presented to that Committee are privileged.
Therefore all documents which do not fall within La.R.S. 44:7D are subject to subpoena.
The plaintiffs then applied to the Louisiana Supreme Court for supervisory writs to review this court's August 29, 1985 decision and were successful. The Louisiana Supreme Court's November 8, 1985 decision stated:
Granted. The judgment of the Court of Appeal is reversed and vacated; the judgment of the trial court is reinstated.
DENNIS, J., concurs in the order and has doubts whether the statute is designed to insulate the records or proceedings of this type committee from discovery since it is not a policy making or personnel committee but purely an investigatory vehicle.
Smith v. Louisiana Health and Human Resources Administration, 477 So.2d 1118 (La. 1985).
There were then further discovery proceedings in the trial court and a February 5, 1986 judgment of the district court stated:
When, after hearing the law, evidence, and arguments of counsel, the Court decided this matter in favor of plaintiffs for reasons orally assigned.
IT IS ORDERED, ADJUDGED, AND DECREED that the defendant, THE DEPARTMENT OF HEALTH AND HUMAN RESOURCES, produce the report of the incident review committee and all communications pertaining thereto as well as any and all statements of witnesses and parties from whom statements were obtained.
IT IS FURTHER ORDERED that, in the alternative, the defendant may present these documents to the trial Judge for a determination of whether they are available to the plaintiff under R.S. 44:7 within ten (10) days.
IT IS FURTHER ORDERED that the defendant have ten (10) days to comply with the order of this Court, and, upon failure to timely do so, the Court will consider the defendants to be in contempt of this Court, and will be ordered to pay the plaintiff the sum of SEVEN HUNDRED FIFTY AND NO/100 ($750.00) DOLLARS in attorney's fees, plus all costs of these proceedings.
The defendants then applied to this court for supervisory writs to review the February 5, 1986 judgment of the trial court and were unsuccessful. The March 27, 1986 decision of this court in number C-5268 stated:
Writs Denied
On June 3, 1985 the trial court ordered production of any and all incident reports and any and all statements of witnesses and/or nurses, physicians and security employees, etc. taken within 24 hours of the incident. We granted a writ and stated that "only incident reports and statements generated and/or requested by the Charity Hospital Incident Review Committee or presented to that Committee are privileged." The Supreme Court reversed and reinstated that trial court judgment (without reasons), except for Justice Dennis' concurrence which declared doubts as to whether the statute insulated from discovery the records or proceedings of this type of committee which is a purely investigatory vehicle.
DHHR's attorney provided to plaintiff all incident reports and statements taken within 24 hours. Plaintiff then filed a Motion to Compel Discovery.

*1189 On Feb. 5, 1986 the trial court ordered production of "the report of the incident review committee and all communications pertaining thereto as well as any and all statements of witnesses and parties from whom statements were obtained" or produce the documents for in camera review. The documents under seal were produced.
DHHR now contends the trial court in the Feb. 5th judgment exceeded the scope of the Supreme Court's mandate which reinstated the original judgment. Apparently DHHR is trying to prevent Judge Ortique's in camera inspection of the committee's records by seeking writs to set aside the Feb. 5th judgment. There is a good argument that the wording of the Feb. 5th judgment greatly exceeds the June 3, 1985 trial court order.
Apparently the Supreme Court would not insulate records or proceedings of this type of committee since it is not a policy making or personnel committee but purely an investigatory vehicle. R.S. 44:7D and R.S. 13:3715.3A do not distinguish the committees. R.S. 13:3715.3A(1) lists as confidential the records and proceedings of a public hospital's quality assurance committee. According to the proffered testimony the Incident Review Committee is a subcommittee of the Quality Care Committee. Its function is to review patient incidents and to make recommendations for corrective action.
We defer to the Supreme Court's determination that the records are not privileged.
The defendants then applied to the Louisiana Supreme Court for supervisory writs seeking review of this court's March 27, 1986 decision and were unsuccessful. The Louisiana Supreme Court denied the writ application with two of the justices dissenting. Smith v. Louisiana Health and Human Resources Administration, 496 So.2d 1031 (La. 1986).
We believe the defendants are foreclosed from raising the privilege issue again by the law of the case. The Louisiana Supreme Court's decision is authoritative and binding upon us. In City of New Orleans v. United Gas Pipe Line Co., 517 So.2d 145 (La.App. 4th Cir.), cert. denied, 488 U.S. 917, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988), the defendant sought to raise the issue of whether the trial judge had erred by failing to recuse himself and, because that issue previously had been decided adversely to the defendant by the Louisiana Supreme Court, this court held that it could not revisit that issue:
We have no authority to consider United's argument that the trial judge, because a member of a plaintiff class of electric ratepayers, should have been recused. Although United cites the later Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the question of recusal in this very case has already been decided, rightly or wrongly, by the Louisiana supreme court: "The motion to recuse is denied on the merits." City of New Orleans v. United Gas Pipe Line Co., 407 So.2d 714 (La.1981). The courts of appeal have no jurisdiction to review decisions of the Louisiana supreme court. La. Const. (1974) art. 5 § 10(A).
517 So.2d at 151. Accord Warren v. Bergeron, 599 So.2d 369, 373 (La.App. 3rd Cir.) (Supreme Court ruling reversing decision of Court of Appeal to change venue was not subject to further review by Court of Appeal under principle of the law of the case.), writ denied, 604 So.2d 995 (La.1992).
We also are constrained, although not to the same extent, by the law of the case as established by this court's second decision on the privilege issue. Board of Levee Commissioners v. Newport Ltd., 578 So.2d 191, 193 (La.App. 4th Cir.) (Under the law of the case principle, "appellate court will not, on a subsequent appeal, re-consider its earlier ruling in the same case." However, the principle is discretionary in that situation.), writ denied, 584 So.2d 681, 683 (La.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1584, 118 L.Ed.2d 303 (1992).
Furthermore, even if the internal investigation report was improperly admitted into evidence, it appears most unlikely that the defendants would have suffered any real prejudice as a result of such an error. See La.Code of Evid. Art. 103(A) ("Error may not be predicated upon a ruling which admits *1190 or excludes evidence unless a substantial right of the party is affected[.]") It is true that in the course of the trial court's Reasons for Judgment, which are eighteen legal-sized typed pages long, there are five brief references to the internal investigation report. However, two of those references concern the leaving of the keys in the ambulance and, as we discussed above in connection with the defendant's third specification of error, we need not review the issue of negligence in leaving the keys in the ambulance. Two of the references were simply to point out that the hospital staff was aware that Mr. Smith was not maintaining bedrest and was having episodes of bizarre behavior. That awareness of the hospital staff also was the subject of other documents and of testimony by hospital staff members, and there was no evidence to the contrary. The fifth reference is to the effect that Mr. Smith was not continuously restrained and that restraints were ordered only on an as-needed basis determined by the nurses. The lack of continuous restraint, and the orders regarding use of restraints (or lack thereof) was the subject of testimony by one of the physicians who treated Mr. Smith and there was no evidence to the contrary. In short, the trial court made limited use of the internal investigation report and, as to those points relevant to our present decision (i.e. not the ambulance keys point), the internal investigation report merely duplicated other undisputed evidence. Under these circumstances, an error in the use of the internal investigation report, if any, is harmless.
In their tenth specification of error, the defendants contend that the trial court erred by awarding damages for Mr. Smith's loss of income. However, reading the relevant portions of the Reasons for Judgment in a common-sense way shows that the trial court specifically did not award damages for Mr. Smith's loss of income. The trial court stated:
The decedent, Harry Smith, was 47 years old at the time of his death. Plaintiffs, Deanna Smith and the decedent's seven major children, have sued the defendants seeking damages for the loss of love and affection, support, and society, loss of consortium, mental and emotional distress and anguish, and the conscious pain and suffering for their father and husband. No credible evidence was presented to the court that showed Mr. Smith survived the initial collision of the accident; thus, this claim of damages is denied. The record in this case also reveals that although Harry Smith was a carpenter he had not worked for a number of years prior to his death. According to Mrs. Smith, social security was his sole source of financial support to her and the children in November of 1983. Recognition of this fact is also reflected in today's judgment.
As opposed to the strained reading of the reasons for judgment by the defendants, we believe the above quoted passage from the Reasons for Judgment shows that the trial judge was denying any recovery for either conscious pain and suffering of Mr. Smith or loss of income of Mr. Smith. Not only did the trial court stress that Mr. Smith had not worked for several years, it surely would have said something about the amount of lost income if it intended to award damages for loss of income of Mr. Smith. Also, at the end of the Reasons for Judgment, the trial court states the damages awarded are "general damages", for whereas damages for loss of income are invariably referred to in this jurisdiction as "special damages".
In their eleventh specification of error, the defendants argue that the trial court erred by failing to "reduce" the damages (i.e. not awarding lower damages) because of an asserted short life expectancy of Mr. Smith. The trial court's reasons for Judgment state:
Defendants have also made much to do of the fact that Mr. Smith was suffering from a terminal illness with possibly six months to a one year to live mitigating factor against damages herein. Whatever the evidence may have been as to his terminal condition, the evidence clearly shows it more probable than not that the accident hastened his death. As noted earlier, the medical evidence showed, by a preponderance, that there was a reasonable possibility of causal connection between the accident and Harry Smith's death. Despite testimony as to Harry Smith's terminal *1191 illness, the court was favorably impressed with the testimony of both Mrs. Smith and the children regarding the effect Mr. Smith's death had on the quality of their lives. According to Mrs. Smith, he was a loving and devoted husband, father and grandfather. The children testified that they enjoyed a warm, close relationship with their father and that he was an exemplary grandfather. No evidence was presented by plaintiffs that indicated any family member suffered unusual psychological or emotional damages as a consequence of Mr. Smith's death. Having surveyed the applicable jurisprudence dealing with the lowest and highest general damage awards in such a case as this, the amounts awarded here fall well within that range of cases. See Bourgeois v. Puerto Rican Marine Manage, 589 So.2d 1226 (La.App. 4th Cir. 1991); Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2nd Cir.1992). Finally, this court's award, based upon the evidence and testimony for the damages sought, is stated as general damages as particularized in the judgment herein.
Under recent Supreme Court cases, our review of the quantum of damages awarded by the trial court is quite limited and great deference must be given to the trial court's determination.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). And, "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review by considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).
Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993).
The judgment of the trial court awarded $325,000.00 to Mr. Smith's widow, $80,000.00 each to six of his children and $100,00.00 to one of his children who is mentally retarded. Applying the standards of review of the Youn and Theriot cases, we do not find that the trial court abused its' discretion in determining the amount of damages. An action for wrongful death of a person may be brought by the surviving spouse and children of the deceased person. La.Civ.Code art. 2315.2(A)(1). The wrongful death action allows recovery for the loss of the love and affection of the deceased person *1192 (and loss of services and support which are not at issue in the present case). E.G., Easton v. Chevron Industries, Inc., 602 So.2d 1032, 1038 (La.App. 4th Cir.), writ denied, 604 So.2d 1315, 1318 (La.1992), Faucheaux v. Terrebonne Parish, Consolidated Government, 625 So.2d 683, 685 (La.App. 1st Cir. 1993).
The defendants' factual contention that, due to his illnesses, Mr. Smith had only days to live at the time he was killed in the accident in the ambulance, obviously was rejected by the trial court which concluded only that Mr. Smith "possibly" had six months to a year to live. A defense expert witness, Dr. John Cook, testified that Mr. Smith's life expectancy was "more likely" days rather than many weeks or months. However, Dr. Cook never treated, examined or even saw Mrs. Smith, but instead based his opinion on review of medical records and other documents. Dr. Albert Diket, who actually treated Mr. Smith, and saw him at least twice a day during the days prior to Mr. Smith's death, testified quite differently.
You know, those things are very unpredictable. You always hear stories of doctors saying they're going to live two months and they end up living two years. It's hard to put a number on it exactly, like two weeks, no I don't recall that we gave him [Mr. Smith] a specific number of when we thought he was going tohow long he was going to live.
Similarly, the third physician who testified, Dr. Harry C. Colcolough, who treated Mr. Smith prior to Mr. Smith's transfer to Charity testified: "I don't think anyone can give an exact [estimate] how long a person is going to live, but certainly he [Mr. Smith] was seriously impaired". We find the trial court was not manifestly erroneous or clearly wrong in rejecting the defendants' factual contention that Mr. Smith had only days to live.
A somewhat analogous case is Taylor v. Charity Hospital, 466 So.2d 736 (La.App. 4th Cir.1985), vacated and remanded for reconsideration on other grounds upon application of plaintiff, 476 So.2d 338 (La.1985), defendant's writ application denied, 476 So.2d 341 (La.1985), reinstated on remand, 481 So.2d 1043 (La.App. 4th Cir.1985). In Taylor, a mother sued Charity for the wrongful death of her six year old daughter. The daughter was terminally ill and semi-comatose because of a brain tumor. As a result of an injury unrelated to her brain tumor, and apparently suffered in the hospital, the daughter suffered bleeding and died. Charity was found negligent for failure to properly treat the bleeding. In reviewing the award of damages to the mother for the loss of affection of the daughter, this court stated:
Appellant places great emphasis on the fact that Leslie was semi conscious and terminally ill for some time prior to the bleeding which prematurely shortened her life. However, we are not prepared to state that the bond between parent and child is broken when the child becomes terminally ill and lapses into a semi-comatose state. Feelings of love and affection transcend the ability to overtly express them. Mrs. Taylor clearly gained some sense of closeness and communication with Leslie by her visits, even if the child was semi-conscious. That sense of love between them was not "lost" until Leslie finally died.
There is no evidence indicating exactly how long Leslie might have lived had she not bled so heavily from the laceration. However, the record does support a finding that the bleeding hastened her death and that as a consequence, Mrs. Taylor was prematurely deprived of the love and affection of her daughter. We see no abuse of discretion in the amount awarded for this loss.
Taylor, 466 So.2d at 740. Mr. Smith was terminally ill, but, unlike the plaintiff's decedent in Taylor, he was fully conscious and communicated with his family until just prior to the date of his death. In fact, Mr. Smith was scheduled to go home in a day or two and his family was looking forward to his return.
The defendants' citation to Burgess v. City of Shreveport, 448 So.2d 861 (La.App. 2d Cir.1984), is not helpful to their position. In that case, the court of appeal merely found that the trial court had not abused its' discretion *1193 in determining the amount of damages awarded to a daughter for the wrongful death of her eighty-six year old mother and, in so doing, remarked that "the [district] court noted the close relationship between the two [mother and daughter], but also considered the short life expectancy of an eighty-six year old person". 448 So.2d at 866. Furthermore, the Supreme Court increased the amount of the award without even taking any note of the deceased mother's age. Burgess v. City of Shreveport, 471 So.2d 690, 694-95 (La.1985).
Nor is the defendants' citation of Crockett v. United States Fidelity and Guaranty Co., 229 So.2d 169 (La.App. 1st Cir.1969), writ denied, 255 La. 286, 230 So.2d 589 (La.1970), helpful to their position. In that case, a suit for the wrongful death of an 86 year old man, the court of appeals merely declined to increase the damage award made by the district court. The Crockett plaintiff pointed to an earlier case with a higher damage award and the defendant argued that the eighty-six year old plaintiff's decedent had a short life expectancy. The court of appeal held that "in making its' award the lower court was bound by neither the [earlier] case nor the life expectancy of the decedent. 229 So.2d at 176 (emphasis added).
Overall, we conclude that the trial court's award of $325,000.00 to Mr. Smith's widow, $80,000.00 each to six of his children and $100,000.00 to one of his children was not a clear abuse of trial court's discretion. "A trial court's attempt to measure the monetary value of intangibles such as grief, loss of love and affection, and loss of companionship are necessarily subject to great discretion.... Thus, the basic question to be considered is whether the general damage award is so high as to shock the conscience of the reviewing court." Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226, 1240 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1299, 1300 (La.1992). We cannot say this award is so high that it shocks the conscience of this court.
The defendants' twelfth specification of error is addressed by the following sentences in their brief:
The Trial Court erred in not reducing the award to $500,000. The defendants pled the defense of the "medical malpractice cap". LSA-R.S. 40:1299.39.
The answer to this argument is that the cited statute is not applicable to this case. The trial court found the state and the hospital itself liable and the medical malpractice cap was not made applicable to the state and its' hospitals until 1988. The statute is not retroactively applicable to this case which involves the 1983 death of Mr. Smith and which was filed in 1983. Directly on point is our decision in Hampton v. Greenfield, 576 So.2d 630, 635-36 (La.App. 4th Cir.), writ denied, 581 So.2d 686 (La.1991). Accord Martino v. Sunrall, 619 So.2d 87, 92 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La.1993). See also Doe v. Medical Center of Louisiana, 612 So.2d 1050, 1052 (La.App. 4th Cir.), writ denied, 613 So.2d 1005 (La.1993) (strict construction of La.R.S. 40:1299:39).
For the foregoing reasons, the judgment of the trial court is affirmed.
CIACCIO, J., dissents with reasons.
CIACCIO, Judge, dissenting with reasons.
I must dissent from the majority's opinion. The trial court found liability on the part of the hospital based on the action and inactions of the hospital staff and based on the hospital's action in leaving the ambulance on the hospital ramp with the keys in the ignition. I find both of these determinations are manifestly erroneous for the following reasons.

Negligence of Hospital Staff
The trial court found that Charity Hospital and its employees were negligent in failing to properly monitor or physically restrain Harry Smith based upon defendants' knowledge of his condition and that this negligence caused decedent's death. However, I find that the record does not support this determination, but rather indicates that plaintiff failed to show that the hospital staff was negligent in its treatment of Mr. Smith.
A plaintiff in a suit against a hospital, as in any negligence action, must prove that the hospital owed a duty to protect the plaintiff against the risk involved, that the defendant breached that duty, that the plaintiff suffered *1194 injury, and that defendant's actions were a substantial cause in fact of the injury. Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 819 (La. 1988).
The record reveals that Harry Smith was admitted to Charity Hospital on November 2, 1983 with a diagnosis of congestive heart failure secondary to cardiomyopathy. He had been transferred from Pendleton Methodist Hospital due to termination of Medicaid coverage. Upon arrival at Charity, Mr. Smith was examined by Dr. Albert Diket, an intern, and was assigned to a ward with twelve other beds.
The patient was ordered to maintain bed rest with bathroom privileges only. When the patient stood up and tried to walk, he would suffer a decrease in oxygen to his brain and become disoriented and confused. Notwithstanding this problem, the medical records indicate that Mr. Smith refused to stay in bed and would walk around the hospital smoking cigarettes.
On November 7, 1983, the records indicate Mr. Smith became confused and stripped his clothing in the ward on one occasion. He also urinated on the floor, apparently because he was confused.
On this date, Mr. Smith was restrained to his bed with arm ties. It was not possible to use ankle ties due to swelling in the patient's feet. Once the patient became oriented and agreed to stay in bed, the restraints were removed.
Nevertheless, from November 7-9, Mr. Smith continued to violate orders of bed rest. The medical records indicate that the nurses repeatedly instructed the patient to get back into bed. The nursing staff again placed him in physical restraints on November 8. The records indicate that the patient continued to get out of bed and walk around in the halls. The records also indicate that the patient continued to suffer disorientation, failed to abide to the bed rest orders, removed the restraints as well as the EKG pads and oxygen monitors and experienced hostile behavior.
The trial court in its reasons for judgment stated that based on the patient's medical condition which was known to the hospital staff, the hospital had a duty to implement any precautions which would prevent predictable future incidents. The court further stated that "the hospital could have, and indeed should have, implemented either a vigorous restraint regiment for the patient or an around-the-clock visual observation of the patient."
In order to meet their burden of showing the hospital staff acted substandardly, plaintiffs introduced the testimony of Celia Krebs, who was accepted by the court as an expert in the field of practical nursing and registered nursing. Ms. Krebs was a licensed practical nurse in 1983 at the time of Mr. Smith's death, and she became a registered nurse in 1986.
Ms. Krebs testified she reviewed the medical records from Mr. Smith's admittance into Charity Hospital and found there had been no nursing care plan prepared for Mr. Smith. She testified the hospital had breached its duty of care to the patient by failing to have such a plan because it was the only way of communicating with the hospital staff who were attending to this patient. She stated it is the nursing standard of care to refer to a care plan in order to treat a patient.
Ms. Krebs also testified that she believed that Mr. Smith's condition required a nurse to keep a constant eye on him, and the nurses present in the ward at Charity were not sufficient for this purpose. She stated that because Mr. Smith had the potential to be confused, the nursing staff was negligent in failing to monitor him constantly.
However, on cross-examination, Ms. Krebs stated that although she did not find a nursing care plan in the record, the nurses' notes did contain references to a plan. She further confirmed that the nursing notes from November 2 through November 7 indicated that Mr. Smith was unwilling to follow medical advice to maintain bed rest. The first episode of confusion was recorded on the afternoon of November 7 and on this date, the patient was physically restrained to his bed. Also, the nursing notes from this date indicate the nursing staff talked with the patient concerning his illness.
*1195 Although Ms. Krebs contends that Mr. Smith was confused due to lack of oxygen and was not informed of the reason he needed to stay in bed, the record indicates the nurses repeatedly instructed the patient to return to bed. The patient continued to disobey the orders and ambulate around the ward. He was found smoking on several occasions and was instructed by the nursing staff to refrain from this activity.
According to Ms. Krebs, the medical records further indicate that on November 8, the patient was combative, although he was noted to be alert and oriented, and began to state he was tired of the hospital and wanted to go home. The nursing notes on November 9 indicate the patient was alert and oriented, although he related that morning he had a fight with a police serviceman.
Ms. Krebs stated that she found no evidence that Mr. Smith was hallucinating and saw no reason why Mr. Smith should be committed. She further stated there was no reason to physically restrain this patient, but based on the episodes of confusion, the nurses should have maintained eye contact with him at all times.
No other expert testimony, medical or otherwise, was introduced by plaintiffs.
Defendants presented the testimony of Dr. Harry Colcolough, Mr. Smith's treating cardiologist. He stated he began treating Mr. Smith in early 1983 for abdominal pain. Mr. Smith was hospitalized and diagnosed at this time with liver enlargement which was caused by alcohol consumption. Mr. Smith had given Dr. Colcolough a history of drinking 6-12 cans of beer daily, mostly on the weekends and smoking 2-3 packs of cigarettes per day for a period of 15-20 years. Dr. Colcolough also stated that Mr. Smith had an enlarged heart and was in the early stages of congestive heart failure.
At this time, Dr. Colcolough advised Mr. Smith to refrain from drinking and smoking, and to maintain a salt-free diet.
Dr. Colcolough saw Mr. Smith in July of 1983 for shortness of breath, edema and abdominal pain. He was hospitalized again and his heart and liver had become larger; and he was diagnosed with severe cardiac insufficiency. Mr. Smith told his physician at this time he was still drinking and smoking.
Mr. Smith was informed at this time that his prognosis was not good, and was instructed to cease drinking and smoking and to maintain a sedentary lifestyle. Dr. Colcolough believed the patient's life expectancy at this point if orders were followed was six months.
Mr. Smith was hospitalized again in October 1983 for congestive heart failure and tests revealed the heart was weaker and there was fluid around his lungs. Dr. Colcolough stated the patient continued to smoke. Dr. Colcolough believed his condition had deteriorated rapidly since the last hospitalization, and there was nothing more that could be done for the patient medically. Dr. Colcolough stated that he explained this to Mr. Smith and his wife; and that his condition was terminal.
Dr. Colcolough testified he had no involvement with Mr. Smith's last hospitalization at Pendleton Methodist hospital.
Dr. Albert Diket testified that he graduated from medical school in 1983, and treated Harry Smith as an intern at Charity Hospital in November of that year. He stated he worked with staff physician Dr. Seese during his treatment of Mr. Smith. He also worked on this case with Dr. Lastra who was a second year resident.
Dr. Diket stated he examined Mr. Smith upon his arrival at Charity and related his history of heart illness. At the time the patient was admitted to Charity he was experiencing severe shortness of breath and had fluid in his lungs and abdomen.
Dr. Diket stated Mr. Smith was placed on several medications and was instructed to maintain bedrest with bathroom privileges only. He stated Mr. Smith violated the bedrest orders and he explained to Mr. Smith that the reason he became short of breath and had chest pains was because he was not staying in bed. Dr. Diket stated that Mr. Smith would become confused when he over exerted himself and insufficient oxygen was reaching his brain.
*1196 Dr. Diket stated he had no knowledge of Mr. Smith hallucinating. The episode of removing his clothes was probably caused by confusion in continuing to get out of bed and move around. At this point, Mr. Smith was placed back in bed and was physically restrained and given medication to calm him down.
Dr. Diket stated he did not order restraints or 24 hour supervision of Mr. Smith based on the episodes of confusion. He stated he believed it would have been cruel to restrain Mr. Smith to his bed during the last days of his life. He also stated it was not possible in Charity or any other hospital to assign 24 hour supervision to such a patient, unless he was in the psychiatric ward, and that wasn't the case here. He testified he did not believe Mr. Smith could have walked as far as the emergency room in his condition.
Dr. Diket stated in his discharge summary that on the day prior to his desertion, Mr. Smith was oriented and was informed that if he left the hospital, he would die. The patient expressed desire to go home, but his family was informed of his condition and wanted him to remain in the hospital.
Dr. John Cook testified for the defense and was accepted as an expert in the field of cardiology. He reviewed Harry Smith's medical records from Charity Hospital and believed the treatment of Mr. Smith by the physicians at Charity was within the appropriate standard of care. He further stated that treatment for Mr. Smith's condition required his cooperation, and that based on the information in his medical records, Mr. Smith was a noncompliant patient. Dr. Cook found that the record revealed instances where Mr. Smith was alert and oriented, yet was walking in the halls smoking, in violation of doctor's orders.
Dr. Cook testified that Mr. Smith's episodes of confusion did not necessarily relate to his heart condition, but were more likely psychological as a result of his stay in the hospital. He stated that many patients who have cardiomyopathy do not experience confusion when walking. Dr. Cook further stated that treatment with chemical restraints such as Haldol, was appropriate for the episodes of the confusion. Dr. Cook stated that he believed it was unnecessary to order 24 hour observation of this patient because the patient was lucid and functioning some of the time and chemical and soft restraints are the appropriate type of care under these circumstances. He further stated he did not believe any physician would place a patient such as Mr. Smith or even a psychotic patient in physical restraints for 24 hours at a time.
Based on his review of the medical records in this case, Dr. Cook testified that Mr. Smith was alert and oriented during the entire afternoon and at the time he left the hospital. He found no signs of confusion or distress on the day before the patient deserted the hospital. Dr. Cook also found that the nurse's notes in this case were not deficient.
Pat Bearce, who was qualified as an expert in nursing, also testified for the defense. She stated that a nursing care plan was contained in the initial assessment of Mr. Smith upon admission to Charity. Although the original plan was not present in the records, she stated it was common for hospitals to discard the plan upon discharge. She also noted that there were several references to the plan throughout the nurses' notes.
Sandra Eaglin testified that she was a nurse working at Charity Hospital at the time Mr. Smith was a patient. On the patient's last night in the hospital, Ms. Eaglin was assigned to an adjacent ward of Mr. Smith's ward.
Ms. Eaglin stated it was the hospital policy in 1983 to have a nursing care plan for patients. This plan was kept in a metal container at the foot of the patient's bed and was not a permanent part of the chart. The plan was discarded after discharge of the patient.
Ms. Eaglin also testified that she saw Mr. Smith at 1:00 a.m. on November 10, 1983 prior to the time he left the hospital, that he was complaining about the noise and that he appeared alert and oriented.
Based on my review of the entire record in this case, I find the evidence insufficient to *1197 show that the hospital staff had breached its duty of care to this patient.
The only witness produced by plaintiffs to meet their burden of proving a breach of the duty was nurse Celia Krebs. Although she stated that the hospital had failed to implement a "nursing care plan" for Mr. Smith, the record does not support her conclusion. Rather, Ms. Krebs admits the nurses' notes contain several references to the "plan," and there was testimony from the nurse who actually treated Mr. Smith that there was indeed a nursing care plan, but that it was discarded upon Mr. Smith's discharge. The record also contains testimony of an expert in nursing who stated it is common in the nursing field to discard the care plan after discharge of the patient.
Further, although Ms. Krebs maintains that the hospital was negligent in failing to monitor Mr. Smith at all times, her testimony fails to indicate that the standard in the hospital industry would be to provide 24 hour supervision in this case. Rather, the record indicates that 24 hour supervision is not possible in other hospitals, except in a psychiatric ward. Further, there was ample testimony from decedent's treating physician that Mr. Smith was not in need of psychiatric care, but rather was alert and lucid when he followed the orders of bedrest.
In addition, the record fails to support Ms. Krebs' conclusion that Mr. Smith was not informed of the reason for the bedrest orders. Decedent's treating physician, Dr. Diket, testified that he repeatedly told Mr. Smith why he must remain in bed, and that decedent and his family were informed of his condition. Further, the nursing notes are replete with incidences where Mr. Smith was found out of bed and was instructed by the nursing staff to return to bed.
In addition, although there was testimony in the record regarding the alleged shortage of nursing staff at Charity Hospital in 1983, there was no evidence presented that any shortage of nurses fell below the hospital standard of care at the time Mr. Smith was a patient. Further, there was no evidence presented that even with additional nurses, other than a nurse assigned specifically to Mr. Smith, that Mr. Smith would have been prevented from deserting the hospital.
Rather, the undisputed evidence reveals that this patient was given orders of bedrest, yet failed to comply. He was repeatedly instructed to return to bed, but ignored the orders. I find that the evidence presented fails to show that the hospital staff could have taken any additional measures to prevent this incident from occurring. Expert medical testimony indicated that 24 hour restraints were not advisable and 24 hour supervision was not possible. Dr. Cook, a cardiologist, testified that the medication administered to decedent and the order of bedrest was the appropriate manner of treating this patient.
I conclude that the evidence presented on the breach of the hospital's duty of care to Harry Smith fails to preponderate in plaintiffs' favor. Rather, my review of the record indicates that the evidence strongly supports a finding that the appropriate standard of care to this patient was met by the hospital staff. The trial court's finding to the contrary is manifestly erroneous.

The Ambulance
The trial court further found that the hospital policy of leaving ambulances parked on the emergency ramp with the keys in the ignition was deficient and was the proximate cause of Mr. Smith's death.
Jon Lowry, the Director of the Ambulance Service for Charity Hospital testified at trial that it was the policy of the hospital that ambulance drivers who leave their ambulances on the emergency ramp must leave the keys in the ignition. The reason for this policy is to permit the security department employees to remove the ambulance from the ramp should the need arise. Dr. Lowry testified that at all times there were numerous ambulances and other vehicles which used the emergency ramp, and the security department had insisted the keys remain in the vehicle for this reason.
It is a well established rule in Louisiana that the leaving of ignition keys in an unattended automobile does not of itself constitute negligence on the part of the owner and he owes no duty to the public at large against *1198 the risk of a thief's negligent operation of the automobile. DeCastro v. Boylan, 367 So.2d 83 (La.App. 4th Cir.1979), citations omitted.
The trial court distinguished the holding in DeCastro on two grounds: first, the hospital had no legitimate reason for leaving the ambulances unattended; and secondly, the claim here was not brought by a third party, but by the family of the operator of the vehicle.
However, the record in this case indicates that the ambulances were left with the keys in the ignition according to established hospital policy. Dr. Lowry testified that the hospital policy was to prevent blockage of the emergency ramp by ambulances where the driver is attending to a patient in the hospital. The evidence indicates that the security guard who was present on the emergency ramp was charged with the task of moving the vehicles as needed and returning the keys to the driver. The policy had a legitimate purpose of allowing continuing access into the hospital facility, and I fail to find sufficient evidence in the record that such a policy was substandard.
Although the DeCastro case found no duty on the part of the owner of an automobile to the public at large against the risk of a thief's negligent operation of the automobile, the trial court nevertheless found liability on the part of Charity Hospital by limiting the holding in DeCastro to third parties who were not involved in the case. By this conclusion, the trial court apparently finds the hospital had a duty to this patient to prevent hospital vehicles from being parked on the emergency ramp with the keys in the ignition.
The standard of care applicable to hospitals has been stated in Keyworth v. Southern Baptist Hospitals, Inc., 524 So.2d 56, 57-58 (La.App. 4th Cir.1988), writ denied, 525 So.2d 1058 and writ denied, 525 So.2d 1061 (La. 1988), citing Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974):
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.
Plaintiffs contend that decedent was hallucinating and suffering from diminished mental capacity at the time he stole the ambulance, and the hospital should have anticipated his actions and attempted to prevent predictable occurrences which may have placed decedent in danger. However, the decedent's medical records indicate that the decedent was not noted to be disoriented or confused on the day he deserted the hospital. Further, the hospital staff and even plaintiffs' expert failed to find evidence of hallucination on decedent's part. In addition, decedent's treating physician testified that he was amazed that plaintiff had reached the emergency ramp, as he did not believe his condition would have permitted such a feat.
Although the hospital has a duty to protect its patients from dangers within its control, I find that the duty of the hospital to its patients did not include the scope of the risk that one of its patients would steal an ambulance from the hospital ramp in an attempt to get home. Mr. Smith performed an intentional act of theft in this case, and I find no duty of the hospital to prevent such an occurrence. This was an unpredictable incident, and the duty of the hospital to protect its patients from harm does not extend to an incident where the patient sneaks away from the hospital ward in the middle of the night and steals a hospital vehicle.
I find that the trial court was manifestly erroneous in finding that the hospital breached a duty to Harry Smith by leaving the keys in the ambulance and that this breach was a proximate cause of his death.
For these reasons, I would reverse the judgment of the trial court and dismiss plaintiffs' suit.